Alright, our second case for this morning is Kleen Products against Georgia-Pacific and Westrock. Mr. Panner. Good morning, Chief Judge Wood. May it please the court. The district court disregarded evidence that would have allowed a jury to conclude that defendants' coordinated price increases were the result of unlawful express agreement, and it did so because it wrongly concluded that this evidence was categorically irrelevant to the claims that plaintiffs pursued below. Now, defendants do not contest- Can you tell me, please, was there any evidence at all here that there was any enforcement or punishment of manufacturers who did not toe the line? Yes, Your Honor. What I would point to in this regard is a rather extraordinary email that appears in the plaintiff's appendix at A929, and it's emails that are sent by Temple Inland in January of 2010. And there's a discussion about whether they ought to try to get business from a specific customer. I think it was called JIN, but I may have that need to coach the customer as to what to tell international paper, because I know there's a price increase that we're trying to put through, and we want to make sure that international paper doesn't think that we're messing this up. Now, that's an extraordinary email. There is no conceivable reason for Temple Inland to be either reluctant to take the business from its competitor or to be worried about what the customer will say to the competitor unless there is a sense of obligation that Temple Inland felt towards international paper and the possibility that international paper would retaliate against that conduct. But to follow up, I think what Judge Rovner was asking, and you offer a number of hypotheses for enforcement mechanisms, which may or may not have been used, but can you point to anything where somebody was in fact punished? Maybe an internal sale didn't happen, or maybe there was some other actual event. Well, I don't think that I can point to anything that is reflected within the record where there's a discussion about here's how we got back at a particular rival. Yes, so and so didn't go along with our price increase, and so we targeted, let's say, an area of the country where they were doing business or in some other fashion. Right, I don't have something specifically like that. What I do have in addition to what I've pointed to is another email that international paper sends in February of 2007 and appears in the appendix at A303, and there is international paper loses some business as a result of a price increase, and it says to, there's an email from an executive to the salesperson explaining that they've lost this business, and says that's okay, and I hope that they tell Georgia Pacific, and I believe it was Smurfit, why they got that business, and that, again, is a remarkable. I'm sorry to interrupt you, but I honestly need help with this, because for each of the behaviors that the plaintiffs have pointed to as evidence of a collusion, it seemed to me that there was an alternative and equally likely explanation that didn't involve price fixing, but rather just ordinary market forces. So it would be helpful for me if, in your responses, you could sort of use that as an outline. Certainly, and I do think, first of all, let me make one legal point, which is, as this court pointed out in the high fructose corn syrup case, it is not the characteristic of the circumstantial evidence that will support a finding of conspiracy in a case like this, that there is only one appropriate interpretation of it. As that opinion says, there are different interpretations for every single piece of evidence that was offered there. Nevertheless, it's the jury's role where a particular interpretation would tend to exclude the non-conspiratorial explanation for conduct. It's the jury's role to make the decision about how best to interpret that evidence. And taking that point, I mean, obviously, as we all know, the summary judgment standard requires all inferences to be taken in favor of the opponent. That would be in your favor in this case. And then to ask, does the evidence so viewed, as I sort of think of it, get across the 50-yard line? Are you somehow now in a position where if a jury buys the package of evidence with the inferences that you think are legitimate, do we have something that shows collusion, not something that shows self-interested, oligopolistic behavior? I think that's exactly right. And again, to bring out some of the other evidence that we've cited, and we've obviously tried to cite a number of categories of evidence in our brief, but there's a remarkable memo that appears in the plaintiff's appendix at 591-592. And it's a memo that's sent by the executive vice president of PCA. And he's talking about how management has decided that there's going to be a price increase. And it's very interestingly worded. And again, a jury could look at that and find it highly suspicious. Because what he says is, you know, it's hard to know when we want to raise price. And management has decided now's the time. And what he says, which again is very curious, is he says the industry has done a good job of reducing capacity and the industry needs this additional money because otherwise we can't cover our costs. Now that's a very strange thing to say if what he's worried about is PCA's circumstances. Well, but why is it, given the nature of oligopoly pricing? It's very interesting to me that on the quantity dimension of things, there are really two different strategies that go along. One of them is just abolishing capacity. That's a very costly strategy, very hard to come right back in again. But the other is just the down time and the slow down time where it leaves some agility for the manufacturers. So you can put up a trial balloon, see if other people follow your price increase. If they do, great, everybody's happy, there's a higher price. If they don't, you just speed the line back up again or you bring it back on again. And I think of it as like airlines. If American Airlines wants to raise the prices on the Chicago to New York route by $100, they announce a $100 increase. And if United and Southwest, et cetera, don't really want to do that, then American just pops it back down to where it was. Right, but there's something more going on, Your Honor, because what happens here is, and we can look at Georgia Pacific emails. One of the points I wanted to get to, I was talking about- Georgia Pacific increased capacity, right, over the course of this. But what they did do was to slow down production at times when it was designed to support a price increase. And I do want to focus- But why wouldn't they do that in their own interest? Why wouldn't they be perfectly happy to see a market-wide price increase? Well, because when they announced the price increase, and that may be followed, but what they are doing is something a little bit different, which is they are artificially restricting, or at least a jury could still find, they are artificially restricting the amount of inventory they have available. But in a way that they can turn it around very quickly, right? But their salespeople are worried that they're going to lose sales, and the only, the most, at least a jury could find, that the reason they had the confidence to do that, the reason that Mr. Fisher was willing to order people, keep your inventories low, keep production slow, notwithstanding the demand that you see, is that it knew, despite the fact that it was a 10% player, it knew that its rivals were similarly going to hold firm to the price increase. And that's why I think- What is really, I think, quite a bit of import, the fact that Georgia-Pacific actually increased capacity consistently throughout the class period. I don't know, you know, how do you ask that? First of all, there's a dispute about what Georgia-Pacific did with respect to its production, and there was expert testimony that showed- There's a question as to, Georgia-Pacific claimed that when it slowed back production or took down time, that it was doing that purely for maintenance reasons. There was testimony by- But are you contesting that over the class period, Georgia-Pacific actually increased capacity? I don't believe we're contesting that. I think those numbers are relatively undisputed. I think the numbers are pretty clear, yeah. So there may be blips along the way, but the line is up. Right, but the focus of this, the focus of the conspiracy is on concerted price increases. And I do want to try to come back one more time to that early 2004 period and this PCA memo and what's going on at Georgia-Pacific. Because the simultaneity of those documents is also very significant. Remember that at this time, the Georgia-Pacific executive is getting complaints from its salespeople that are saying, we're not getting enough supply into our box plant so that we can supply our customers. We're losing orders. Can I just interrupt and say, you've emphasized this a couple of times, that sales were lost. I accept that. I mean, taking the record favorably to you, sales were lost. But lost sales doesn't necessarily mean lost profits, right? It depends on how much profit per sale happens. Do we have profit data? I don't believe that we've seen evidence of what the- but remember, these are price takers. And so the question is whether- Well, they're not exclusively price takers, right? Well, none of them have the power, and this is why I think it's significant what Georgia-Pacific is doing. Georgia-Pacific is a 10% player or 11% player in the market. They do not have enough- they don't have an ability by themselves to cause- Right, right. I think that's clearly right, yeah. And so as a result, when they say, we're going to give up sales, we're going to pull down inventories to create scarcity that our customers see, that's a strange thing to do unless they have confidence that other producers are going to be doing the same thing. And we see that- Can I just say, I think there are two branches to that. They're going to do it if they have confidence that others will follow, kind of the interstate circuit Toys R Us story. Or they'll do it if they say, we're just sticking our big toe in the water. We'll wait a couple weeks, see what happens, but we can quickly recover again. Right, but how do- but again, the plaintiffs- I mean, the defendants can make some of these arguments. No question about it. But if you look on the plaintiff's side, you say, wait a minute. Why is PCA telling its salespeople in March, do not- we're going to get three price increases in the next 18 months. The industry needs that. Don't budge. While at the same time, GP is telling its people, we're keeping inventories low to support a price increase. Now, sure. And remember, the only price increase that is otherwise reflected in the record was from March of 2003, which failed. And so we see a completely different outcome from this one. And, you know, I've focused on this, but there are additional e-mails that a jury could look at and say reflect a sense of, for example, a sense of felt obligation on the part of the defendants to follow a price increase. There's Smurfit Stone- And many of the price increases seem to have been led by non-defendants. Well, it's true that six of the 15 price increases did not hold. Only two of the price increases were led by Longview Fiber. That was late in the class period. Once the pattern was very well established, they may have felt like they could take advantage of it. But the key point is that that itself shows that the defendants were attempting to push through price increases when market conditions did not warrant it. Sometimes they succeeded. Sometimes they did not. But I think that that is- But collectively, you've argued they have market power. It's very much like the European Union's shared dominance theory, except we don't happen to have it. Right. For sure, collectively, they have market power. And again, the question is- I take it that there's really no dispute. The question is, do we have enough evidence here of the sort of traditional conspiratorial kind to, as Your Honor said, push it across the 50-yard line such that a defendant, a jury, could look at that and say, that coincidence is too much for me to accept, or that statement doesn't seem to me to be consistent with unilateral conduct. How could Smurfett, for instance, participate in a conspiracy when it was under the oversight of a federal bankruptcy court, the UCC creditors, and financial advisors hired by the UCC oversight group? How could that be? Well, Your Honor, I mean, I think, first of all, by the time that they joined the price increase that was announced in late June of 2010, they were coming out of bankruptcy. And their announcement was made on July 1st when they had been discharged from bankruptcy. And that's the basis for their liability. But furthermore, a jury could find that these were moves that were justified by the management, I mean, the debtor in possession of the company made these decisions further to a plan that they had made. And that indeed- and there's evidence to back that up. There's a statement in an internal Smurfett presentation that says, by closing these plants, we will communicate to external audiences that we are doing a good job of supporting these price increases. Your Honors, I see that I only have about four minutes left. You may save the rest for rebuttal. Thank you, Your Honor. Ms. Stetson, are you the first one up? Good morning, Your Honors. May it please the Court, my name is Kate Stetson. I'm representing the appellee, Georgia Pacific, and I'm splitting my time with Ms. Pepes. Judge Rovner, I want to start with one of your first questions, which had to do with whether the conduct that's being challenged here is alternatively and equally likely explained by ordinary market forces. And I think that is exactly the point, that what the plaintiffs are challenging here, the conduct they are challenging, is ordinary conduct that the plaintiffs are repeatedly labeling remarkable, when in fact there's nothing remarkable about it. But how in the ordinary market would somebody know that in the coming 18 months or so, whatever it was, there are going to be three $50 price increases? People don't know that without some kind of prearrangement. No, but I don't think that that particular piece of evidence suggests industry knowledge. It's an industry prediction that the market supports that. One of the problems with... Let me just push back on that a little bit. I would say, looking at this record, that it's certainly one on which a rational jury could find in favor of your clients. But that's not quite the question. The question is, is it so clear based on the undisputed facts and the reasonable inferences that no jury could find for your opponents that we take this away from the jury? And there's a lot that's shady about all of this, whether it's planned price increases, whether it's signals coordinating actions, what I will call maybe the non-economic evidence. We all understand the economic evidence is ambiguous because oligopolies are oligopolies. There's certainly a lot of market harm here. Whether it's redressable market harm is another matter. So, Judge Wood, just to take your question in two parts. First, on the standard, I want to make clear what the standard is because I think it's not something that you see repeated very often in the plaintiff's briefing. The standard in this court and the standard that the Supreme Court articulated in Matsushita is that to get past summary judgment, a plaintiff in a Sherman Act conspiracy case... Yeah, we know that. ...has to put on evidence that tends to exclude the possibility of independent action. So it's not just a question of competing inferences. If the inferences are in equipoise, summary judgment is granted for the defendant. So that's the standard question. Right, and that's why I said past the 50-yard line. Whatever metaphor you want, evidence doesn't come in little packages that we can just stack up, unfortunately. And so when you have evidence that suggests that these dominant companies are sitting down and saying, look, we need a stronger price point in the market, let's act together, wink, wink, and get the price to go up by $200 a ton, that's a problem. If they're all just playing footsie with each other, they're all just watching what's happening and making adjustments in quantity and seeing which price increases stick and which ones don't, then there's a gap in the antitrust laws. It doesn't cover that. That's correct, and that is what happened here. Well, I know that's what you say happened. The way that you formulated your question was all the defendants sit down and talk about putting together a price increase. What's remarkable about this case is after six years of discovery, millions of pages of documents, dozens of depositions, what the plaintiffs haven't pointed you to is that evidence that there was anyone who sat down and talked about it. Sure, but you would agree that it's possible to prove a case by circumstantial evidence. To the extent the defendants are arguing that only direct evidence will do, the law does not support that. Oh, no, that's not our argument at all. And I will say this is a very experienced industry when it comes to antitrust, and so it wouldn't surprise me if well-counseled clients knew that you didn't put stuff like that down in the minutes. Well, the fact that it's an experienced industry is an argument that the plaintiffs have made as well, but propensity doesn't suggest liability here. We know, of course, that it is illegal for competitors to communicate in advance about price changes, but those price changes obviously become public at some point, and others can follow. But what about supply reductions? That doesn't become public information, but, yeah, wasn't there some evidence here that there was follow-the-leader-like behavior in regards to supply reductions as well? Judge Rodner, there was no follow-the-leader supply reduction evidence. To the contrary, what Judge Leinaweber pointed out in his opinion is that there were, in fact, supply reductions around the times of price increases, which is exactly what you would expect in a functioning market that looks like this. And on Georgia-Pacific in particular, I want to be very clear that the idea that Georgia-Pacific somehow participated in a conspiracy to reduce capacity is completely belied by the fact that Judge Wood, I think you mentioned, Georgia-Pacific increased its capacity by 11% during this class period. So the notion that there was a conspiracy involving Georgia-Pacific, which you didn't hear very much from Mr. Panner, to reduce capacity is completely belied by the record. The other point that Mr. Panner made with respect to Georgia-Pacific had to do with inventory. But, of course, inventory is different than capacity. Inventory is the stuff that you have that you haven't yet sold. And Georgia-Pacific, as we explained in our brief, from 1999, well before this class period, had a run-to-demand strategy where they would produce what their customers required. They never missed supplying. That was very fashionable from the 1980s forward after the Japanese had their just-in-time systems. Yes, and perhaps that's why Georgia-Pacific introduced it. But the important thing is that that strategy, and it was something that even plaintiffs' expert conceded, was an appropriate and sound thing to do market-wise. Now, I want to make a point. You each asked a question, Judge Rovner and Judge Wood, on enforcement. And I do think that this is worth bringing home because in the very few cases where this court has reversed a summary judgment, so I'm talking about high fructose and JTC Petroleum in particular, you had mechanisms there that were readily evident that punished people who didn't get with the program. And Judge Wood, I think you asked, was someone in fact punished on this record? The answer is no. You can see that from the fact that six of these 15 price increases failed. And everyone knew who was responsible for it. If you look at the joint appendix sites in our brief to exactly this proposition, what the plaintiffs called the cheaters were very evident on the face of the record. And yet there was no punishment mechanism. In fact, plaintiffs' own expert at Joint Appendix 534 conceded that there wasn't an enforcement mechanism in place. He argued that it didn't matter. Of course it matters. Every case from Matsushita on talks about the importance of shoring up a cartel by punishing the people who do something wrong, who do something not in favor of the cartel. Well, you can't have a cartel with an ineffective, let's say, enforcement mechanism. It really depends on how closely knit the cartel is and whether everyone is willing to give a little bit of a pass to people. I'm even thinking of OPEC. I mean, there's only so much that one sovereign nation can do to another sovereign nation if somebody throws a few more barrels of oil into the market. That's true. But I think what's unusual about this case compared to, as I said, the other cases where that enforcement mechanism was not just present but utilized, is that Mr. Panner conceded to you, as he had to, that there's no evidence that anyone was punished. There is, in fact, precious little evidence that there was even a capacity to punish. There's a reference, I think, in the plaintiff's brief to the idea that Georgia Pacific, by slowing back, because, of course, remember, Georgia Pacific didn't shut down anything and ran at 100 percent capacity for most of the months of this. But Georgia Pacific, by slowing back some portion of its capacity, could potentially punish. So did Georgia, help me for this, it was my impression that Georgia Pacific, I think you just said it but I want to nail it down, did not engage in what I'm calling kind of permanent capacity reductions, just selling a plant, destroying it, pulverizing it, whatever, that they just did these more versatile changes. They did. And that's exactly the point that I think is a distinguishing characteristic between the conduct that you might expect from a member of a cartel and the conduct that you would expect from a member of a functioning oligopolistic market. Your point earlier had to do with this notion of perilous leading. If you shut a mill, you are taking a huge leap that people follow you. If you slow back. Or you're not if there's a cartel. Or you're not if there's a cartel. But to Georgia Pacific's specific circumstances, if you slow back, as you said, there's a chance to pick up. And on slow back, I would also note, with respect to Georgia Pacific, Georgia Pacific took no economic slow back or down time for 40 of the 47 months of this so-called conspiracy. So whatever mechanism was there was something that was simply unavailable to punish, even if the idea of punishment had been floated. There was no punishment. In the instances in which one company was the leader, I want to look at the failed instances, the six times it didn't happen. And the company that was the leader realizes, well, this is just not going to stick. Do we have evidence of quantity increasing at that point? Or do we have evidence? What does the market evidence show when the price slips back again to where it was before? That, I assume, is the definition of a failed effort. I don't think there is evidence of quantity increasing after that. And, of course, in addition to the failed price efforts, what is evident from the class period that we're talking about, there were huge plummets in the price during the Great Recession, of course. In 2008 and 2009, the price, to my recollection, dropped $100 in the span of just several months. Right. It didn't recover. I mean, overall, the full period, there's a very significant increase. Over a long period of time, yes. But what's missing from Mr. Panner's presentation, both in his brief and today, is the evidence of an agreement, an agreement to fix prices. Everything that you have heard and everything that we have discussed is ordinary market conduct expected from market participants in a small, concentrated industry. So you think the only evidence of an agreement would be an informant or, I mean, obviously there's plenty of opportunity to agree. These people talk to each other day and night. They're meeting constantly. And so, you know, if I were advising a cartel, I would say just make sure you're practically in bed with everyone else. You know, just, you know, don't ever leave them. And that way you can say, oh, we were talking all the time, so there are no inferences possible. That seems a little offbeat to me. My time is up. May I answer that? Please do, yes. We will not punish your colleague. So just to start with that last point, the plaintiffs make much of the fact that there were many trade association meetings. First of all, there are nine trade associations in the mix, each of them with subcommittees, climate change, government regulation, and so forth. So that's not surprising. The phone calls are equally not surprising because this is a small market that trades with each other constantly. What is surprising is that what plaintiffs can't show you with all of those meetings and all of those phone calls is one instance where someone in a deposition or in a document says here is what we agreed in that meeting that we're going to do to fix prices. That is the difference in response to your question about what would count. What would count is the statements in high fructose. We have an understanding in the industry. We don't undercut each other's prices. What would count is JTC Petroleum, where there was evidence of a significant pretextual reason why one non-joiner was punished for not going along with the crowd or an informant. All of those things are possible. All of those things have been found to warrant summary judgment reversal. This Court has never reversed a summary judgment on evidence as anemic as this. All right. Thank you very much. And we'll give Ms. Pappas her eight minutes. Good morning, Your Honor. May it please the Court. Elizabeth Pappas for Defendant Appali, West Rock CPLLC. I'll start with the Court's questions specific to our client's position in the case. Mr. Panner answered Judge Rovner's question, how could we possibly participate in a conspiracy like this under the extraordinary supervision of the bankruptcy court by going to the post-discharge period? It's undisputed. We came out of bankruptcy in June of 2010, four months before the class period ended. Everyone agrees. We are out of this case. We don't go to a jury if or unless the plaintiffs can show summary judgment evidence of an antitrust violation in that post-discharge period. So what does that mean? I'm going to modify what you said just a tiny bit. I think what needs to be shown is evidence that after your client comes out of bankruptcy, it rejoins the conspiracy. If it rejoins the conspiracy and ratifies all the things that have gone on during its absence, the potential for liability is much greater. If it didn't rejoin the conspiracy, it had its discharge in bankruptcy, it can't be held liable for anything that happened up until that time. So I think that's what we need to focus on. I will focus on that, Your Honor, with a footnote, that because we have to have the antitrust violation and this is not a government case, injury is an element. You need proof of that to go to a jury. Otherwise, there's no point. They can't prove what they need to prove under the Clayton Act. But let me start with the question. Is there evidence in the post-discharge period that our client joined this conspiracy? Joined or rejoined, whichever. Whichever, but you have to show that we manifested agreement that we did something that was conspiratorial. To sign up with these folks, yes. Three points I'd like to cover. The first is in the post-discharge period. They don't even get to the 50-yard line, but even if they did, they don't have enough to take it over. Why? Let's look at the record. It is undisputed. At this stage, we have to look at the whole record. It is undisputed on capacity. This is at page 11 of our brief. We were up 35% post-discharge over 2005. Undisputed. It's also undisputed. We did not raise our prices in that period. The price announcement failed. It is also undisputed that we won $68 million in share by price competing with other manufacturers in the post-discharge period. It is also undisputed that when we announced our increase, it was validated and verified by an unprecedented and extraordinary number of third parties, as Judge Rovner indicated. That is all undisputed. The court must consider that evidence, as Judge Rovner pointed out, of independent, oligopolistic behavior. What do the plaintiffs have to counter it? They have the price announcement that, number one, failed. Number two was led by a non-defendant. Number three was announced by our client after months of internal analysis. The record sites are at pages 10 to 11 of our brief, under the auspices of our UCC, seven independent creditors, and the bankruptcy court. There is no evidence in any way. So you're stressing that with the evidence of what led up to the price increase, there's all of this studying that was going on, no indications, because somebody was at a trade association meeting or in any other way communicating with the other companies. So here we have the pile of undisputed evidence. I mentioned 35% up on capacity, no price increase. We won $68 million in share. That all looks very competitive, at least at a minimum, oligopolistic to me. What do they counter with? A failed price announcement led by a non-defendant, in our case supported by independent analysis, and I would add, on top of it all, after a long period where, unlike High Fructose, unlike Toys R Us, we were doing all of these assessments and pursuing these increases because we were hurting on cost. And I think this is critical. Well, you are a company that shut down a lot of supposedly very inefficient capacity. You bought that one big mill and shut down some other things. And I'm so glad you asked about that because that's the point. It's not whether you shut down a mill. It's whether you're taking production out of the system. Now, you can do that, by the way, and it's perfectly lawful, so that isn't even evidence of anything. But let's stop. Let's go all the way with the plaintiff's analogy. Let's say we're going to go outside of the post-discharge period for color, at least. We have to be careful. Well, for intent. You can look at pre-discharge evidence for some purposes. Yeah, so let's do the look back. I would submit we're done at the post-discharge because they don't even get close to the 50-yard line, but they say, no, you have to look back for the intent for the color. Okay, what do we see? I'm so glad you asked this because the 35% figure on page 11 of our brief, that's after discharge over 2005. Now, for the cuts, what do we see? First of all, unlike text messaging or Toys R Us, there's no abrupt shift, right? When you look at the pre-class period, 1998 to 2002, our client was already shutting mills. Why? We had a merger. We were inefficient. We weren't doing it to take capacity out. In fact, what you see, undisputed, is our capacity goes up, right, and we need price increases to recover costs. This is true pre-class period. There's no shift. Now we're in the class period, right? 2003, we have this strategic plan. We've got to cut. We bought the Stevenson mill. It allowed us to meet all of our customer demand more efficiently. So what did we do? We shut the less efficient mills. To Judge Roper's question. In other words, what you are saying is that if plaintiffs use your pre-discharge conduct to demonstrate your modus operandi, it really helps you. Indeed, exactly. And let me continue to say why. Because 03, we do the rationality plan. We cut. 05, our strategic reassessment. We continue to cut. 07, we do an internal study that shows we are up in overall capacity. This is at Special Appendix 239 to 40. In 2008 and 09, we have a small dip. Why? We sold our Bruton facility to Georgia Pacific. Those tons didn't come out. In 09, we go into bankruptcy because we are so heavily financed. And I meant to say to Judge Roper's question, these capacity cuts were public. When our board approves them, we do, in fact, report them for purposes of securities disclosures, right? Then we go into bankruptcy. Exactly. So this is not a secret. It's well documented. We're doing it for the financial health of our company. Nonetheless, we had heavily leveraged debt in 2009. This is a funny coincidence, but it was after the crisis. We were scheduled to close on a refi on September 17th of 09. Credit markets crashed on September 15th. We go into Chapter 11. We continue to manage capacity with this extraordinary supervision. We support the price increases for cost recovery. There is not a record I can think of in a Section 1 case in any circuit that would ever on this kind of evidence, when you look at it holistically under the standard that started in market forces in 1990 all the way through dairy and tax, when you say, can they get to the 50-yard line? And even if they can, it's got to be something more. It's not the standard on page 32 of their brief. They say we have the burden of ruling out conspiracy. That is not the law. No, no, no. I mean, we understand what the burden is. Natsusha's been around since 1986. So, yeah. So I think, you know, the history here, and then one other thing I'd say is on the closures. They mentioned, you know, these kind of inter-trades and closing mills and then not letting them reoperate. I would say the CERCLA liability point is well documented in our brief. Yeah, I was going to say, you mentioned the CERCLA, the remediation, that that was the reason you weren't selling it to a different producer. Correct. Because the environmental, I mean, of course, the environmental liabilities extend backwards and forwards and sideways, you know, if it's CERCLA. And that was to the point where the accreditors committee wanted us to do more but to take that off the balance sheet, right, or to indemnify a buyer. And in some of the instances we offered to sell the facility, right, like I think it was the Snowflake one, and the buyers didn't want to operate it. And then for the Go Greens, like the remediation, the promise is we won't put it back into use as a mill, and that takes it off the balance sheet. So this is all undisputed. I think when you weigh this against what they've got, which is these inferences, they simply cannot get to a jury on the record against us. Okay. Thank you. Well, thank you very much. Mr. Panner, anything further? Actually, Mr. Panner, as you're walking up, I would like to tell you that I would like you to comment a bit about the particular situation of whatever we want to call them today, Westrock or Smurfett or whatever. I'm sorry, I missed the beginning of your question, Your Honor. I want you to talk about the Westrock situation. Certainly. So let me first, with regard to that, address what I think we've got to show, and that is that if there was a preexisting conspiracy in which Smurfett was participating, then when they said on July 1 that when they announced that price increase and they, as Pap has ignored the internal e-mail that says, we always follow IP, so we're going to announce, now that international paper has announced. But is that illegal? I mean, suppose that's true. Let's assume that statement's true. We always follow IP. If there's no agreement, they just read the Wall Street Journal one day and discover, oh, look at that, IP, you know, pop their prices up $50. Of course. But if these price increases were taking, if these concerted price increases were taking place pursuant to agreement, then the participation in that price increase in 2010 was an overt act in furtherance of the conspiracy that was taken post-discharge. But you're asking us to assume the issue at stake, which is, was it pursuant to agreement? Certainly not. Certainly not. We obviously have to prove that there was a preexisting conspiracy to fix prices in which we were participating. Well, and a decision to, what I'm saying, to rejoin that agreement after all the process that's gone on through the bankruptcy. And if those agreements, if those price, concerted price increases were pursuant to agreement, then choosing to participate in that concerted price increase in 2010 was an overt act in furtherance of that conspiracy. If there was an agreement, but where's, but just saying we'd like to follow IP or we always follow IP or anything like that. Why is that evidence of agreement? Because if they had agreed pre-bankruptcy, there was no withdrawal from the conspiracy. Do we have anything from IP that says, and we always expect Westrock, I'll just call them that for simplicity, to follow us or Westrock has promised us they will always do what we did. We don't have anything like that. What you have, Your Honor, is all of the evidence of the existence of a conspiracy in which both IP and Westrock were participating. But we have nothing from IP that says it is our understanding or expectation or whatever other word you might want to use that Westrock is going to follow us. So our back is covered because we're going to take this step, but we know Westrock will be right there behind us. Nothing like that. There's substantial evidence, Your Honor, and it's difficult in an oral argument to try to hit at every piece of significant evidence. I know because you've given us, and I have to say I'm baffled by your delusions, but anyway. Baffled, I'm so sorry. By the redactions that you chose to make, having looked very carefully what they were. They were the, I plead innocent because I believe those are the defendant's redactions, Your Honor. But I do want to try to talk about some of the categories of evidence that the district court ignored. Again, pursuant to legal error, for example, the conduct of Smurfett Stone prior to the discharge. And again, Ms. Pappas misspoke when she said that Georgia Pacific, excuse me, Smurfett increased capacity 35%. Georgia Pacific took out, and indeed there's an email that says, we've done our part. Smurfett? Smurfett. Yeah. Took out a million tons of capacity. What they increased by 35% was the productivity per mil, which is a completely different issue, which is all fine. But the point is that the email, there's emails that refer to the fact that they have done their part to support a price increase. And that is suggestive of the fact that they were working pursuant to obligation. There's an email from Smurfett, October 2006, in the joint appendix A-6-17, in which Smurfett says, we have little choice but to join the price increase, even though they thought it was not well-timed. That suggests a sense of obligation, not independent choice, which, again, a jury could see as evidence of agreement. At A-6-20, from December of 2009, we have no choice but to support the pricing initiative that others had announced. The district court completely ignored the 20 vice president level calls in May of 2008 that preceded the announcement of the price increase, including calls between Georgia Pacific and Smurfett, and including that were participated in by the executive at Georgia Pacific, who was controlling the degree of production and inventory to comply with the increase. It's ignoring the prior evidence of increase. We've talked about the PCA memo. And now you need to wrap up, I think. Well, Your Honor, I would just also say, obviously our expert, Ms. Stetson, referred to a couple of matters that were not contested. They are contested. With respect to whether Georgia Pacific was taking economic downtime, with regard to whether there was an enforcement mechanism, and also my last statement, I promise, was that there was no evidence of enforcement in H-F in the high fructose case. What there was was a suggestion that they had the ability to enforce by virtue of increased capacity. And, of course, there was exactly the same sort of evidence here. Thank you, Your Honor. All right. Thank you very much. Thanks to all counsel. We will take the case under advisement, and the court is going to take a brief recess.